## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

LEBSOCK 7, LLLP, a Colorado Limited Liability Limited Partnership; and
DAVID AND CHERYL LEBSOCK, individuals;

Plaintiff,

v.

BANK OF COLORADO, a Colorado chartered commercial bank.

Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Lebsock 7, LLLP ("Lebsock 7") and David and Cheryl Lebsock (the "Lebsocks," collectively the "Lebsock Parties"), for their Complaint and Jury Demand against the Defendant Bank of Colorado states and alleges as follows:

### PARTIES

1.      Lebsock 7 is a Colorado limited liability, limited partnership with its principal place of business in Colorado.

2.      David Lebsock is an individual who resides in Sterling, Colorado.

3.      Cheryl Lebsock is an individual who resides in Sterling, Colorado.

4.      Bank of Colorado (the "Bank") is a Colorado-chartered commercial bank with its principal place of business in Colorado.

## JURISDICTION AND VENUE

5.     The United States District Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1334, 1337, 1367, and 18 U.S.C. §1964(a).

6.     This United States District Court for the District of Colorado has personal jurisdiction over the Bank of Colorado because it is a Colorado-chartered commercial bank.

7.     Venue is proper in the District of Colorado, per 28 U.S.C. §1391(a)–(b) because wrongful conduct and the events or omissions giving rise to the claims occurred in the District of Colorado.

## GENERAL ALLEGATIONS

### I.     The Lebsock Parties' Loan and Guaranty Agreements with the Bank

8.     Beginning in 2006, the Lebsocks and several companies in which they had an interest borrowed money from the Bank in a series of loans (the "Loans").[1]

9.     The Lebsocks personally guaranteed all of these Loans.

10.     Lebsock 7 guaranteed eight of the Loans.[2] The guarantees provided by the Lebsocks and Lebsock 7 are collectively referred to below as the "Guaranties."

---

[1] Specifically, the Loans that were taken out by the Lebsocks or Lebsock family-related entities from the Bank had the following loan numbers: 6525013406, 6525017630, 6525012292, 6525012293, 6525014378, 6525017079, 6525016397, 6525017080, 6525017589, 6525011715, 6525016162, 6525016691, 6525017629, 6525015300, 6525016882, 6525017631, 6525017749, and 6525016433.
[2] Specifically, loan numbers: 6525012292, 6525012293, 6525014378, 6525017079, 6525016882, 6525017631, 6525017749, and 6525016433

11.     Additionally, two loans were made directly to the Lebsocks as the borrowers.[3]

12.     By early 2020, the Loans were in default (the "Loan Default").

13.     The value of the Collateral (the "Collateral") for the Loans in Loan Default far exceeded the amount due under the Loans in Loan Default.

14.     On April 20, 2020, the Bank and the Lebsock Parties executed a six-month forbearance agreement (the "Forbearance Agreement").

15.     After the six-month term of the Forbearance Agreement, the Lebsock Parties were again notified by the Bank that they were in default on the Loans (the "Forbearance Default").

## II.     Defendant's Wrongful Conduct

### A.  *The Bank Authorizes John O'Brien to Act on Its Behalf to Financially Dismember the Lebsock Parties and Their Related Entities*

16.     The Bank was represented by its authorized agent John O'Brien of the law firm Spencer Fane, LLP (individually and collectively "O'Brien"), whose conduct the Bank expressly or impliedly authorized, ratified, and affirmed.

17.     O'Brien prepared the Forbearance Agreement for the Bank and charged over $100,000 in attorneys' fees to do so. The Bank added these fees to the indebtedness of the Lebsock Parties and Lebsock-related entities.

---

[3] Specifically, loan numbers 6525013406 and 6525017630.

### B. *O'Brien and the Bank Refuse Offers to Be Paid-in-Full for the Loans*

18.     After the Forbearance Default, other creditors of the Lebsocks and Lebsock-related entities conveyed offers to the Bank to pay the Bank in full the amounts due under the Forbearance Default by purchasing the Collateral to continue to be operated by the Lebsocks as a going concern.

19.     One creditor sent such an offer to O'Brien on February 11, 2021, which the Bank's executive officer testified under oath that he had never seen.

20.     If O'Brien even passed these offers onto the Bank, the Bank refused to listen to or entertain any such offers. O'Brien even made litigation threats against those conveying the offers.

### C. *O'Brien and the Bank Initiate Unnecessary Receivership Action*

21.     On December 31, 2020, the Bank, through O'Brien, filed the case captioned *Bank of Colorado v. Lebsock et al.* in the District Court for Logan County, Colorado.[4]

22.     On that date, in violation of Rule 8 of the Colorado Rules of Civil Procedure, the Bank filed a two-hundred-and-seven page, 1,145-paragraph Verified Complaint, which incorporated by reference 1,512 pages of exhibits, in the Logan County District Court, seeking the appointment of Thomas Morrow as Receiver.

---

[4] Case No. 2020CV30064 (the "State Court Action")

23.     The Verified Complaint was subscribed, sworn, and acknowledged by the Bank's executive officer, Dan Walter, expressly ratifying and affirming the convoluted and unnecessarily prolix complaint.

24.     While overly complicated and enormous in its volume, essential information is omitted from the two-hundred-and-seven pages of the Verified Complaint, which therefore requires constant reference to the 1,512 pages of exhibits for all of the one-hundred-thirty-one claims for relief contained in the Verified Complaint, making it impossible for a court or a defendant to comprehend the facts and claims without spending multiple days sorting through the combined over 1,780 pages of the Verified Complaint and exhibits.

25.     The over 1,780-page Verified Complaint, including exhibits, is convolutedly written and organized, further impeding the ability of any court or party to understand or respond to the Verified Complaint adequately.

26.     The Bank incurred over $81,500 for O'Brien to draft and file the unnecessarily complex Verified Complaint, which the Bank added to the indebtedness of the Lebsock Parties and Lebsock-related entities.

### D. The Extensive Relationship Between Morrow and O'Brien and History of Dismantling Family Farming and Ranching Businesses

27.     Before commencing the State Court Action against the Lebsocks et al., O'Brien had selected and obtained the appointment of the same receiver, Thomas

Morrow, in at least forty-three of forty-eight prior Morrow receiverships, thereby disqualifying him as an appropriately neutral receiver in the State Court Action.

28.     In all of the prior forty-eight receiverships, Morrow had never sold a business or farming operation as a going concern, and thus had no experience doing so. In all forty-eight receiverships, the sale of farming or business assets occurred through the liquidation and sale of assets at a steep discount, as opposed to the sale of a "going concern" or operating business.

### E. The Bank and O'Brien's Failure to Disclose their Past and Ongoing Relationship with Morrow to the Logan County District Court

29.     Neither the Bank nor O'Brien disclosed to the Logan County District Court that O'Brien had previously obtained the appointment of Morrow in over forty-three prior receiverships of the total forty-eight receivership to which Morrow has been appointed.

30.     On January 5, 2021, the State Court, unaware that Morrow was not qualified to be the receiver due to his impermissibly close relationship with the Bank through O'Brien, appointed Morrow as receiver for numerous Lebsock-related entities in the State Court Action.

31.     Part of the order appointing the receiver in the State Court Action provides that the receiver's duties are to "enter into such further contracts and arrangements as are **reasonably necessary to maximize the proceeds**" of the Receivership Estate (emphasis added).

### F. Morrow Lacked Independence and Always Acted as the Bank's Behest

32.     Morrow never operated as an independent receiver; instead, his conduct was entirely based on directives he received from the Bank. Thus, while he purported to "act" as a receiver, Morrow was merely another authorized agent of the Bank.

33.     Even though operating the Lebsock-related businesses or selling them as a going concern was in the estate's best interest, as well as the best interests of the equity holders and all other creditors, Morrow testified under oath at an examination conducted under Fed. R. Bankr. P. 2004, that "yes" he followed instructions the Bank gave him at the time of his appointment as receiver to liquidate the business' assets—businesses that Morrow knew at the time were operating profitably.

34.     Morrow also testified under oath that for nearly eighteen months, he, as the receiver, did not have separate counsel but instead relied on counsel for one secured creditor—the Bank's counsel, John O'Brien—to draft dozens of agreements and notices, as well as other pleading and filings, that O'Brien as the Bank's counsel filed on behalf of Morrow as the receiver. Thus, in addition to the Bank and O'Brien instructing Morrow on his actions, the Bank and O'Brien also controlled Morrow's actions through his total reliance on O'Brien for drafting agreements between various third parties for the receiver and drafting and filing documents with the court.

35.     Morrow testified that he was entirely unaware that he (and his agents) had charged over $700,000 in "protective advances" to the Lebsock-related Loans, the remaining two of which should have long ago been paid off by the property Morrow and the Bank liquidated and sold. Morrow also testified that he was entirely unaware that O'Brien had charged $1.2 million in "protective advances" to the Lebsock-related Loans, the remaining two of which should have long ago been paid off by the property Morrow and the Bank liquidated and/or obtained authorization to sell. Thus, the Bank, one of several creditors of the Lebsock Parties and the Lebsock-related entities, was in sole control of adding indebtedness to the Lebsock Parties and the Lebsock-related entities, much of which had nothing to do with "preserving" the estate or "protecting" the Collateral.

36.     Because the Bank either directed or ratified Morrow's actions, Morrow's conduct, as the Bank's authorized agent, is attributable to the Bank. Because the Bank either authorized, affirmed, or ratified O'Brien's actions, O'Brien's conduct, as the Bank's authorized agent, is attributable to the Bank.

37.     From the moment of his appointment, Morrow began a course of action not designed to maximize the proceeds for all creditors but instead designed to overcharge the Lebsock Parties and collect more than the Bank was entitled to, including in fees for himself, his agents, and the Bank's agents, including O'Brien. None of these fees were reasonable nor necessary, especially in light of the offers

from other creditors of the Lebsocks and Lebsock-related entities to repay the Bank in full in mid to late 2020.

38.     The Bank intended that these additional charges would be added to the Loans, covered by the Guaranties, and thus collected from the Lebsock Parties.

### G. O'Brien and the Bank Continue to Refuse for the Bank to Be Paid-in-Full for the Loans

39.     Within weeks after January 5, 2021, the Bank received additional offers to pay all amounts due under the Forbearance Agreement by purchasing the Collateral as a going concern.

40.     The Bank intentionally refused to convey these offers to Morrow, necessarily causing Morrow not to accept such offers.

41.     Upon information and belief, the purpose of the rejection of the full-payment offers was to keep the Lebsock Parties' Loan open in order to allow the Bank, O'Brien, Morrow, and his agents to incur additional fees they would not be entitled to collect from the Lebsock Parties if the Forbearance Agreement was paid off. These amounts were then added to the Loans so that the Lebsock Parties, as Guarantors, would have to pay these additional amounts.

42.     Morrow's conduct in the State Court Action included:

   a.     Following the directions of the Bank rather than exercising his independent judgment;

   b.     Following the directions of the Bank rather than maximizing the value of the estate;

c.   Liquidating, at a heavy discount, the Collateral rather than even considering a sale as a going concern;

d.   Rejecting full-price offers for the Collateral;

e.   Authorizing payment without reviewing the agent's bills for reasonableness;

f.   Billing for periodic reports of the receiver while filing not a single receiver report;

g.   Paying expenses that were not reasonable, such as insurance on Collateral that had been sold and was no longer property of the Estate;

h.   Overpaying expenses; and

i.   Borrowing to operate the Estate against lines of credit that had previously been paid in full.

### H. Tortious acts committed by Morrow

43.   While purporting to act as receiver, Morrow, as an authorized agent for the Bank, committed at least the following tortious acts:

a.   Charging fees and expenses to two remaining Lebsock-related Loans, one of which was over-secured but which the assets securing the loan were all but abandoned by the receiver, and the other of which was a paid-off business line of credit for which he had liquidated all of its assets.

b.    Taking direction from the Bank rather than independently deciding what was best for the Receivership Estate.

c.    Failing to sell the Collateral as part of an operating business or going concern, but, rather, selling it at a liquidation fire sale, significantly reducing its value.

d.    Authorizing, paying, or incurring expenses at the direction of the Bank that were neither necessary for the preservation of the Estate assets nor reasonable in relation to the work actually performed

### I.   *Ultra Vires acts committed by Morrow*

44.    While purporting to act as receiver, Morrow committed at least the following acts outside the scope of the Order Appointing Receiver:

a.    Acting at the direction of the Bank;

b.    Seizure and closure of the grain elevator properties; and

c.    Authorizing and employing agents at the direction of the Bank that were neither necessary for the preservation of the Estate assets nor reasonable in relation to the work actually performed

45.    O'Brien, as the Bank's agent, committed the following wrongful acts:

a.    Presenting Morrow to the court in the State Court Action as a properly independent receiver;

b.    Withholding from disclosure to the Logan County District Court that O'Brien had "hand-picked" Morrow to serve as the receiver in at least forty-three prior receivership actions;

c.    In presenting Morrow as an appropriately neutral receiver candidate, O'Brien used the U.S. Postal Service or interstate wire services;

d.    Sending fraudulent over-billings to the Bank, which the Bank paid and added to the total amount of the Debt guaranteed by the Lebsock Parties;

e.    In sending the false and inflated billings to the Bank, O'Brien used the U.S. Postal Service or interstate wire services.

### J. Needlessly Putting Related Entities Out of Business

46.    In the afternoon on December 31, 2020, the Bank swept and cleared out every bank account of every borrower or party related to the Lebsocks.

47.    Sometime in January 2021, the Bank, Morrow on the Bank's behalf, or both, went to one or more Ace Hardware stores owed by Lebsock-related entities (which were part of the Collateral), cleaned out cash from the registers, had a locksmith lock up the stores, and told all employees that the stores were closed.

48.    These Ace Hardware stores had consistently generated approximately $1.5 million in annual profits, which were used to service debt. If the stores had

continued to be operated, they could have continued to generate profits that could have paid both the Bank and other creditors of the Lebsock-related entities.

49.     To the detriment of the Lebsock Parties, the Lebsock-related entities, and any other creditors of the Lebsocks and their related entities, the Bank and Morrow sold the inventory of Ace Hardware Stores at wholesale price, as opposed to operating these stores at a consistent and significant profit.

50.     The Bank could have been repaid in full without needlessly and intentionally causing the Ace Hardware stores to close and cease operations immediately.

51.     On January 11, 2021, the Colorado Department of Agriculture sent a letter to Morrow regarding the license expiration to sell commodities for Lebsock-related entity L7 Grain, LLC.

52.     To the detriment of the Lebsock Parties, the Lebsock-related entities, and any other creditors, rather than renewing the license and operating the profitable grain sale business, Morrow caused the grain sale business to fail and then impermissibly, without a license himself, sold the grain elevator inventory for deeply discounted wholesale prices.

53.     The Bank knew that shutting down the grain elevator business of the Lebsock Parties and the Lebsock-related entities would cause a host of other unsecured creditors to file claims against the property of the Lebsock Parties and would destroy any prospect of continued business operations.

### K. Unnecessary for the Receiver to Be Appointed at All

54.     Aside from the Lebsocks themselves, no person or entity had greater insight into the value and incumbrance of Lebsock's property and Collateral than the Bank.

55.     From the Bank's more than twenty years of knowledge and control over the affairs of the Lebsocks, it was aware that the borrowers and guarantors related to the Lebsock Parties and Lebsock-related entities had an equity cushion of approximately double what was owed to the Bank.

56.     From the Bank's more than twenty years of knowledge and control over the affairs of the Lebsocks, it was aware that it had perfected security interests in Collateral far exceeding the total of the indebtedness owed to it.

57.     The Bank sought the appointment of a receiver knowing that the Bank's interests in the Collateral of its borrowers and guarantors related to the Lebsock Parties and Lebsock-related entities were not in danger of being lost, removed beyond the jurisdiction, or materially injured or impaired.

58.     The Bank, knowing that its Collateral and ability to recover for all indebtedness of the Lebsock Parties and Lebsock-related entities were not in doubt, failed to allege anything in the Verified Complaint about its Collateral being endangered in any way.

59.     In the proposed order that the Bank submitted with the Verified Complaint, which the Logan County District Court entered without alteration, the

only finding related to the Bank's Collateral being endangered was that the Lebsocks had consulted with a bankruptcy attorney, which would in no way jeopardize the first position, secured creditor when the available Collateral had an equity cushion of more than $10 million.

### L. O'Brien Churns Fees Only for Its Own Pecuniary Benefit and Because the Bank Intended to Add the Expense to the Lebsocks' Indebtedness

60.    O'Brien, the Bank's authorized agent, charged the Bank over $1.2 million in total fees for the unnecessarily complex and unneeded state court receivership action, bankruptcy representation, and interference with the Debtors' attempts to work with their other creditors. By way of example only, O'Brien charged the Bank over $30,000 in legal fees for drafting an unnecessary motion in the bankruptcy case of the Lebsock-related entity, Rosie's, LLC. The Bank added the expense of O'Brien's legal fees to the Lebsock's indebtedness.

61.    By way of further example, the attorneys' fees for which O'Brien invoiced the Bank included a quarter-hour of O'Brien's time on a near daily basis to review a report that only changed, if at all, by two lines on a monthly basis. The Bank reviewed O'Brien's invoices with all of this unnecessary billing, and the Bank approved for O'Brien to be paid and for the expense of these legal fees to be added to the Lebsock Parties' indebtedness to the Bank.

### M. After Foreclosures Could Have Repaid All Loans, the Bank Leaves Two Loans Unpaid to Keep Charging "Protective Advances" Against the Lebsock Parties

62.     After the Bank foreclosed on and liquidated enough of the property of the Lebsock Parties and related entities to be able to pay off the Loans in their entirety, the Bank left two of the Loans outstanding so that it could continue to charge hundreds of thousands of dollars in claimed "protective advances" against those loans to pay for expenses like O'Brien's excessive legal fees and Morrow's unnecessary (because all assets had been sold) receiver fees.

63.     The claimed "protective advances" served no benefit in "preserving" the estate or "protecting" the Bank's Collateral and only facilitated O'Brien needlessly charging attorneys' fees after sufficient Collateral had been liquidated (or authorized to be liquidated) sufficient to repay all indebtedness.

### N. The Bank Takes $450,000 from Inheritance Funds in Which the Bank had No Interest

64.     On August 19, 2021, the Bank demanded and received a payment of $450,000 from David Lebsock's inheritance from his late father. The Bank wrongly claimed to have a security interest in these funds.

### O. The Bank Intentionally Interferes with the Lebsock Parties' Contracts and Prospective Business Advantages

65.     The Lebsock Parties guaranteed loans that other Lebsock-related entities owed to Galinn Fund, LLC; 59 Investments, LLC; and Harvest Moon, a series of Granite Hall Master Fund Series LLC ("Harvest Moon").

66. The Bank knew about each of these guarantees that the Lebsock Parties had entered into with Galinn Fund, 59 Investments, and Harvest Moon.

67. The Bank knew that by seizing the assets in every bank account of the Lebsock Parties and every Lebsock-related entity, liquidating the entire inventory of the hardware stores, grain elevators, and otherwise, and seizing all of the farming equipment, the Bank would necessarily prevent the Lebsock Parties from performing as to the loans with Galinn Fund, 59 Investments, and Harvest Moon.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Violation of RICO – 18 U.S.C. § 1962(c))

68. The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

69. At all relevant times, the Lebsock Parties were each a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

70. At all relevant times, the Bank was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

71. At all relevant times, O'Brien was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

72. At all relevant times, Morrow was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

73. At all relevant times, the Bank, O'Brien, and Morrow formed an association-in-fact to defraud money from the Lebsock Parties and others. This

association-in-fact was an "Enterprise" within the meaning of RICO, 18 U.S.C. §
1961(4).

74.    At all relevant times, the Enterprise was engaged in, and its activities
affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

75.    At all relevant times, the Bank conducted or participated, directly or
indirectly, in the conduct of the Enterprise's affairs through a "pattern of
racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation
of RICO, 18 U.S.C. § 1962(c).

76.    Specifically, at all relevant times, the Bank engaged in "racketeering
activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth
above. The acts set forth above constitute a violation of one or more of the following
statutes: 28 U.S.C. §1341 (mail fraud); 28 U.S.C. §1343 (wire fraud); and C.R.S. §
18-4-401 (theft by threat or deception). The Bank, O'Brien, and Morrow each
committed, aided, or abetted the commission of two or more of these acts of
racketeering activity.

77.    At least two participants in this Enterprise have repeatedly acted in
concert to achieve the wrongful objective of dissipating any equity the borrowers
may have had in the Collateral that was pledged or willfully disregarded the
interests of the borrowers in the Collateral or the preservation of any equity
therein.

78.     The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, common victims (the Lebsock Parties), a common method of commission (unnecessary receivership and wrongful collection activities), and the common purpose and common result of defrauding the Lebsock Parties and other junior creditors of the Lebsock Parties.

79.     As a result of the Bank's violation of 18 U.S.C. § 1962(c), the Lebsock Parties have been damaged in an amount to be determined at trial.

**Second Claim for Relief**
**(Theft by Deception C.R.S. §18-4-401)**

80.     The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

81.     As the Bank's agent, O'Brien sent false and overstated invoices to the Bank.

82.     The Bank paid O'Brien's false and overstated invoices and added the amount of the payments for the false and overstated invoices to the Debt.

83.     The Bank then sent the false and overstated amounts claimed due under the Guaranties to the Lebsock Parties via the United States Mail or interstate wire services.

84.     The Bank did so with the intent to deprive the Lebsock Parties of the money permanently.

85.   As a result, the Bank has committed Theft by Deception.

86.   As a result, the Lebsock Parties have been damaged in an amount to be proven at trial.

## Third Claim for Relief
## (Civil Theft C.R.S. § 18-4-405)

87.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

88.   As the Bank's agent, O'Brien sent false and overstated invoices to the Bank.

89.   The Bank paid O'Brien's false and overstated invoices and added the amount of the payments for the false and overstated invoices to the Debt.

90.   The Bank then sent the false and overstated amounts claimed due under the Guaranties to the Lebsock Parties via the United States Mail or interstate wire services.

91.   The Bank did so with the intent to deprive the Lebsock Parties of the money permanently.

92.   As a result, the Bank has committed Civil Theft.

93.   As a result, the Lebsock Parties have been damaged in an amount to be proven at trial.

**Fourth Claim for Relief**
**(Intentional Interference with Contractual Relations)**

94.     The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

95.     The Lebsock Parties have entered into or had the reasonable expectation that they would maintain or enter into contracts or business relationships with certain third parties, including, by way of illustration and not of limitation, the other junior lien creditors of the Lebsock-related entities.

96.     By taking the unnecessary actions that the Bank took to put Dave Lebsock, LLC and L7 FM Elevator, LLC out of business and to impede the business of other Lebsock-related entities, the Bank intentionally interfered with the Lebsock Parties' ability to perform their contracts with third parties.

97.     The Bank was aware of these contracts and prospective business relations of the Lebsock Parties.

98.     By the wrongful conduct complained of herein, the Bank intentionally and improperly interfered with The Lebsock Parties' contracts and business expectancies by the conduct described above.

99.     The Bank's conduct as complained of herein was knowing, willful, malicious, and deliberate.

100.    The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

**Fifth Claim for Relief**
**(Intentional Interference with Prospective Business Advantage)**

101.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

102.   The Lebsock Parities had certain prospective business relationships, including customers of their operating businesses.

103.   The Lebsock Parties would have profited from those prospective business relationships.

104.   The Bank intentionally and improperly interfered with those prospective business relationships by the conduct complained of herein.

105.   The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

**Sixth Claim for Relief**
**(Breach of Fiduciary Duty)**

106.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

107.   A fiduciary relationship was created between the Bank and the Lebsock Parties by virtue of the multi-decade relationship between the Bank and the Lebsock Parties, the Bank's exertion of control over both the Lebsock Parties and Morrow, and the Bank's special and confidential knowledge of specifics relating to the assets of the Lebsock Parties, including the great degree to which the Bank

was over-secured by Collateral that had been pledged by the Lebsock Parties and related Lebsock entities and persons.

108.   As a receiver, Morrow owed a fiduciary duty to all creditors of the receivership estate.

109.   Morrow breached this fiduciary duty by, among other things:

    a.   Following the directions of the Bank rather than exercising his independent judgment;

    b.   Deciding to liquidate the Collateral in his estate rather than even considering a sale as a going concern.

    c.   Rejecting full-price offers for the Collateral as a going concern.

    d.   Not reviewing the Bank's counsel's bills for reasonableness.

    e.   Not reviewing other agents' bills for reasonableness.

    f.   Paying expenses that were not reasonable, such as insurance on Collateral that was no longer in the Estate.

    g.   Borrowing against lines of credit that had previously been paid in full to operate the estate.

110.   Morrow took all of the foregoing actions at the direction and behest of the Bank, acting as the Bank's authorized agent.

111.   The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

112.   The Bank had received more in pledged Collateral than it had loaned.

113.    As a result, the Bank was over-secured.

114.    As a result, the Bank owed fiduciary duties to other creditors and to the equity holders that pledged Collateral.

115.    By the acts complained of herein, the Bank breached those fiduciary duties by, among other things:

a.      Rejecting full-price offers for its Collateral and/or the purchase of the Loans in Default;

b.      Obtaining the appointment of a "receiver" that was not neutral and therefore not qualified to be receiver;

c.      Directing the receiver to liquidate rather than sell as an operating business or going concern;

d.      Charging claimed "protective advances" to Loans that were (or should have been) paid in full;

e.      Failing to transmit to the Receiver full-price offers for the Collateral; and

f.      Authorizing, ratifying, and affirming the acts and billings of its attorney agents for services that were neither necessary nor reasonable, and adding those expenses to the loan balances it collected from the Lebsock Parties.

116.    The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

**Seventh Claim for Relief**
**(Breach of Contract—Breach of Good Faith and Fair Dealing)**

117.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

118.   The Forbearance Agreement constitutes a contract.

119.   The Forbearance Agreement includes terms of which the Bank has discretion, including what actions it may take in the event of a default under the Forbearance Agreement.

120.   The implied covenant of good faith and fair dealing requires the Bank to exercise terms as to which it has discretion in the Forbearance Agreement in good faith.

121.   The Bank breached the covenant of good faith and fair dealing by, among other things:

    a.   Rejecting full-price offers for purchase of the Loans in Default and/or all of the Collateral as an operating business or going concern;

    b.   Seeking the appointment of Morrow as the receiver when Morrow was not appropriately neutral and when such appointment was not necessary;

    c.   Seeking the appointment of a receiver at all when the Bank's interest in the property was not endangered in any meaningful way and certainly not endangered to a degree where the Bank,

in its discretion under the Loans and Forbearance Agreement, was acting in good faith in seeking a receiver's appointment.

    d.    Not disclosing to the Court in the State Court Action that Morrow was not properly neutral and therefore not qualified to be receiver;

    e.    Directing Morrow to sell the Collateral in a liquidation, rather than sale as a going concern; and

    f.    Accepting false and overstated invoices from its agent, O'Brien, and adding the charges on those invoices to the Debt.

122.    The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

## Eighth Claim for Relief
### (Unreasonable Disposition of Collateral)

123.    The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein

124.    The Bank had a duty, pursuant to C.R.S. §4-9-607(c) and otherwise, to dispose of Collateral commercially reasonably.

125.    The Banks breached this duty by, among other things, liquidating the Collateral at fire sale prices rather than selling it as a going concern.

126.    The Lebsock Parties have been damaged by the Bank's conduct as complained of herein, in an amount to be determined at trial.

## Ninth Claim for Relief
### (Abuse of Process)

127.    The Lebsock Parties incorporate by reference every allegation

contained in this complaint as if fully set forth herein.

128.    The Bank filed the State Court Action with an ulterior motive, i.e., to

put the Lebsock Parties out of business and to increase the fees of its agents and

charge the Lebsock Parties with the same.

129.    Morrow, as the Bank's agent, proceeded with the State Court Action

with an ulterior motive, i.e., to increase the fees of its agents and charge the

Lebsock Parties with the same.

130.    The Bank, both directly and through its agents O'Brien and Morrow,

willfully improperly used the legal process.

131.    As a result, the Lebsock Parties have been damaged by the Bank's

conduct as complained of herein, in an amount to be determined at trial

## Tenth Claim for Relief
### (Fraudulent Transfers Under C.R.S. §§ 38-8-105(1)(b) and 38-8-106(1)
### Through 11 U.S.C. § 544(b)(1))

132.    The Lebsock Parties incorporate by reference every allegation

contained in this complaint as if fully set forth herein.

133.    When, beginning in January 2021, O'Brien, Morrow, and the Bank

caused various Lebsock Parties and Lebsock-related entities to incur indebtedness

or guarantees of indebtedness for the unnecessary claimed "protective advances,"

the Lebsock Parties incurred an obligation without receiving a reasonably equivalent value in exchange for the obligation.

134.   At the time, the Lebsock Parties were engaged or about to be engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

135.   At the time, the Lebsock Parties were insolvent or became insolvent due to the obligations created by the protective advances.

**Eleventh Claim for Relief**
**(Fraudulent Transfers Under § 548(a)(1)(B))**

136.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

137.   When, beginning in January 2021, O'Brien, Morrow, and the Bank caused various Lebsock Parties and Lebsock-related entities to incur indebtedness or guarantees of indebtedness for the unnecessary "protective advances," the Lebsock Parties incurred an obligation within two years of February 1, 2022, but the Lebsock Parties received less than a reasonably equivalent value in exchange for the obligation.

138.   At the time, the Lebsock Parties were insolvent when this obligation was incurred or became insolvent due to the obligation.

139.   At the time, the Lebsock Parties were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with them was an unreasonably small capital.

## Twelfth Claim for Relief
### (Preferential Transfers Under § 547(a))

140.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

141.   The Bank's demand that the Lebsocks transfer $455,878.71 on August 19, 2021, from them through the Estate of the late Paul Lebsock, Jr., over which the Bank had no perfected security interest, was a transfer to or for the benefit of the Bank, who was a creditor with an antecedent debt owed by the Lebsocks before the transfer was made.

142.   The Lebsocks were either insolvent at the time, rendered insolvent thereby, or were left with insufficient capital to continue to do business as a result thereof.

143.   Given the Bank's decades-long relationship with the Lebsocks and their entities and the control exerted over the Lebsocks and their entities, the Bank is a statutory or non-statutory insider as defined by the Bankruptcy Code and case law thereunder. The transfer was within one year of the Lebsocks filing their Chapter 11 case on February 1, 2022.

144.   The Bank received $455,878.71 more than it otherwise would have in a chapter 7 bankruptcy and no other provision of title 11 provided for such a payment of these inheritance funds to be made to the Bank.

## Thirteenth Claim for Relief
### (Disallowance of Claim Under 11 U.S.C. § 502(b))

145.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

146.   The Bank has recovered more than it was properly owed through all of the Bank's efforts to foreclose on and liquidate the property of the Lebsock Parties and Lebsock-related entities.

147.   The Lebsocks object to Claim No. 17, given that this claim is unenforceable against the Lebsocks and property of the Lebsocks , under any agreement or applicable law, based upon, among other things, principles of accord and satisfaction.

## Fourteenth Claim for Relief
### (Accounting)

148.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein.

149.   The Lebsock Parties are entitled to an accounting from the Bank and its agents, including all its regarding all monies connected with the Loans and the Guaranties.

## Fifteenth Claim for Relief
### (Imposition of a Constructive or Resulting Trust Upon Inequitably-Obtained Profits)

150.   The Lebsock Parties incorporate by reference every allegation contained in this complaint as if fully set forth herein

151.   In equity, the Court should impose a constructive or resulting trust upon all profits inequitably obtained by the Bank, either directly or through its agents.

**WHEREFORE**, Lebsock 7, LLLP, David Lebsock, and Cheryl Lebsock pray for judgment against Defendant Bank of Colorado as follows:

A.   That Plaintiffs be awarded damages, including compensatory and punitive, in an amount to be determined at trial based on each of the claims set forth herein;

B.   That Plaintiffs be awarded treble damages for the Bank of Colorado's RICO, and Civil Theft damages under 18 U.S.C. § 1964(c) and C.R.S. §§ 18-17-106(7) and 18-4-401, et seq.;

C.   That judgment be entered in Plaintiffs' favor that liens and obligations against their property are avoided under state law and the bankruptcy code;

D.   That judgment be entered in favor of the Plaintiffs that all transfers and obligations avoided are preserved for the benefit of the Debtors' estate;

E.   That Claim No. 17 in the Lebsock's Chapter 11 case be disallowed;

F.   That the Bank of Colorado be ordered to provide an accounting for all monies received relating to the Loans or the Guaranties;

G.   That a constructive or resulting trust be imposed on the illegal profits generated as a result of Bank of Colorado's wrongful conduct;

H.     That Plaintiffs be awarded their reasonable attorney's fees and costs of suit under 18 U.S.C. § 1964(c) and C.R.S. §§ 18-17-106(7) and 18-4-401 et seq., or otherwise;

I.     That the Plaintiffs be awarded pre-judgment and post-judgment interest and its costs of the litigation; and

J.     That Plaintiffs be awarded such other relief as the Court may deem just and proper.

**David W. Lebsock, Cheryl R. Lebsock, and Lebsock7, LLLP, demand a trial by jury on all issues so triable.**

Dated this 3rd day of October 2022.

Respectfully submitted,

*/s/John M. Tanner*

John M. Tanner, Colorado Bar No. 16233
FAIRFIELD AND WOODS, P.C.
1801 California Street, Suite 2600,
Denver, Colorado 80202
(303) 830-2400
JTanner@fwlaw.com
*Attorneys for Lebsock7, LLLP*

&

*/s/Patrick D. Vellone*

Patrick D. Vellone, Colorado Bar No. 15284
Lance Henry, Colorado Bar No. 50864
Brenton L. Gragg, Colorado Bar No. 52528
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
(303) 534-4499
PVellone@allen-vellone.com
LHenry@allen-vellone.com
BGragg@allen-vellone.com
*Attorneys for David and Cheryl Lebsock*